UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **DIMITRY BAUM and DAZ GLOBAL, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**GRAINIER FRANCHISE COMPANY, LLC,**<br>**GRAINIER HOLDINGS USA, LLC,**<br>**LUIS HERNANDEZ, and**<br>**ALEJANDRO MOLANO PARRA,**<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 24 C 151<br>)<br>) Judge Rebecca R. Pallmeyer<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

From late 2021 onward, Plaintiff Dimitry Baum was in negotiations with representatives of the international bakery chain Grainier to open a Grainier franchise in Chicago. Those negotiations broke down in mid-2023—but by then, Baum (on behalf of Plaintiff DAZ Global, LLC) had already signed a ten-year lease to operate a Grainier-branded café. He alleges substantial damages from his initial investment in renovation and down payment costs, as well as from the potential consequences of being unable to operate the location as a Grainier franchise. Plaintiffs sued in state court to recoup their losses, alleging breach of contract, unfair and deceptive business practices, and other Illinois statutory and common-law claims. Defendants removed the case to federal court on diversity grounds and countersued for both breach of contract and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs have now moved to dismiss Defendants' Lanham Act counterclaim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons explained below, that motion is denied.

## BACKGROUND

The factual background for this case is highly contested. The court presents the agreed facts below, referring both to Plaintiff's complaint and the allegations of the counterclaim, and noting uncertainties where relevant.

Plaintiff Baum is an Illinois citizen and resident of Lake Barrington, Illinois. (Compl. [1-1] ¶ 1; Notice of Removal [1] ¶ 8.) Defendants Grainier Franchise Company, LLC ("Grainier Franchise") and Grainier Holdings USA LLC ("Grainier USA") are Florida LLCs indirectly owned by citizens of Spain and Colombia.[1] (Grainier Defs.' Suppl. Jurisdictional Statement [34] at 1–2.) According to draft franchise disclosure documents filed as exhibits to Plaintiffs' complaint, Grainier Franchise and Grainier USA are the U.S.-based affiliates of Consupan, S.L., another Spanish entity that owns intellectual property rights to the Grainier Bakery brand. (Compl. Ex. G [1-1] at 145.)[2] These same documents describe Grainier Bakery as a "European bakery and café" chain that originated in Barcelona, Spain in 2010 and now operates more than 380 locations in Spain, Portugal, Italy, and the United States. Grainier locations serve pastries, breakfast items, sandwiches, and other light fare, as well as coffee and juices. (*Id.* at 146.) Consupan's trademark "GRAINIER BAKERY" is registered as number 5,343,444 on the Principal Register of the U.S. Patent and Trademark Office. (Am. Answer, Affirmative Defenses and Countercls. [20] (hereinafter "Answer") at 35 ¶ 55.). It sublicenses this mark, as well as other IP such as copyrights, "know-how and trade secrets," to the Defendant LLCs for use in developing the

---

[1] The initial Notice of Removal in this case omitted several details about the corporate parties' ownership, making it unclear whether Defendants had satisfied their burden of proving complete diversity of citizenship. *See* 28 U.S.C. § 1332(a); *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007) ("For diversity jurisdiction purposes, the citizenship of an LLC is the citizenship of each of its members.") Pursuant to the court's order [31], Defendants submitted a supplemental jurisdictional statement clarifying that Defendants Grainier Franchise and Grainier USA are both wholly owned by Grainier Pastry and Bakery Coffee LLC, which is in turn jointly owned by Capital Capture S.L. and World Oventures LLC. (Grainier Defs.' Suppl. Jurisdictional Statement at 1.) Capital Capture S.L. is a Spanish LLC owned by two individual citizens and residents of Spain, while World Oventures is a Florida LLC wholly owned by an individual citizen and resident of Colombia. (*Id.* at 1–2.) Plaintiff DAZ Global, LLC, meanwhile, is a Florida LLC owned by Dimitry Baum and Anastasiia Baum, both citizens and residents of Illinois. (*Id.* at 1.) With these details clarified, the court is satisfied that complete diversity exists among all parties.

[2] All exhibits to Plaintiff's state-court Complaint are collected on this docket in a single entry, docket number 1-1. Citations to the Complaint's exhibits use the ECF page ID numbers for this document.

Grainier brand in the United States. (*Id.* ¶¶ 55–56; *see* Compl. Ex. G at 145.) To date, Grainier USA has opened at least four U.S. Grainier-branded locations (either directly through subsidiaries, or by sublicensing the Grainier IP to licensees) in Florida and Virginia. (Compl. ¶¶ 10–14, Ex. G at 145–46.)

Plaintiffs allege that, in late 2021, Baum began discussions with Defendant Luis Hernandez—a Spanish citizen and resident affiliated with Grainier Franchise and Grainier USA[3]—about the prospect of opening a Grainier location in Chicago. (Compl. ¶¶ 7, 15.) In March 2022, Baum introduced Hernandez to a realtor who was working with Baum to identify potential locations. (*Id.* ¶ 17.) By the following month, Baum and his realtor had zeroed in on a 5,500-square-foot unit located at 525 South State Street in Chicago's South Loop neighborhood. (*Id.* ¶ 21, Ex. B at 44.) Through his realtor, Plaintiff submitted a nonbinding letter of intent to lease this unit for ten years as a "Grainier Franchise"; Hernandez's degree of involvement in and approval of this letter is a matter of dispute. (*Id.*; Answer at 4–5 ¶¶ 21–26.)

Negotiations over the Chicago Grainier location, including the terms and conditions of a potential franchise, continued through the summer of 2022. (Compl. ¶¶ 27–32.) In August 2022, Hernandez took a leave of absence and was replaced on Grainier's side of the table by Defendant Alejandro Molano Parra, a Colombian citizen residing in Spain. (*Id.* ¶ 33; Notice of Removal ¶ 11.) Molano Parra introduced Baum to an architect who had previously worked on other U.S. Grainier locations. (Compl. ¶ 58.) In September 2022, Molano Parra traveled to Chicago and visited the State Street location with Baum: while Plaintiffs allege that he told Baum he "liked" the location and was "excited" about Plaintiff's proposal (*id.* ¶¶ 36–38), Defendants counter that

---

[3] Defendants Hernandez and Molano Parra's precise roles in the Grainier organization are unclear. Plaintiffs alleges that Hernandez served as the CEO of Grainier USA from 2019 to January 2023 and that Molano Parra served as an Authorized Member for both Grainier Franchise and Grainier USA, but Defendants deny both points in their answer. (Answer at 2 ¶¶ 6–7.) The draft disclosure document lists Hernandez as CEO of both Grainier Franchise and Grainier USA and Molano Parra as the "Franchise Director" of Grainier Franchise. (Compl. Ex. G at 148–49.)

Molano was concerned about the location's size and expressed that "the expense of such a site could threaten viability and approval of the location" (Answer at 8 ¶ 38).

On October 1, 2022, Molano Parra sent Baum a packet of information about the Grainier brand and the steps of opening a franchise. (Compl. ¶ 40, Ex. D at 53.) Along with this packet, Molano Para also sent Baum a Confidential Disclosure Agreement ("CDA") with terms clarifying that no offer of a franchise could be made before all applicable requirements under state and federal law had been satisfied.[4] (Ex. 1 to Def.'s Opp. to Pls.' Mot. to Dismiss Am. Countercl. [27-1] at 2.) Plaintiff signed this document the following day. (*Id.* at 3.)

Baum continued to take steps towards opening a Grainier franchise in the fall and winter of 2022, including visiting Spain to tour the parent company's facilities and meet with its founder Juan Pedro Conde. (Compl. ¶¶ 43–44.) Conde, in turn, visited Chicago in November 2022 and toured the State Street location with Baum and Molano Parra, sharing thoughts and feedback. (*Id.* ¶¶ 50–55.) Throughout this period, Baum asked repeatedly when he might see an official written offer, and Molano Parra assured him that a formal Franchise Disclosure Document was in the process of being drafted and would be ready shortly. (*Id.* ¶¶ 48, 57.) On December 1, Baum asked Molano Parra "if the franchise contract was ready because he had construction quotes and was ready to sign the lease." (*Id.* ¶ 61.) Baum and Molano Parra had a call shortly thereafter;, the content of their discussion is disputed. (Answer at 13 ¶ 62.)

On December 23, 2022, though he had not yet received Defendants' Franchise Disclosure Document, Baum signed a lease for the State Street location on behalf of his LLC DAZ Global. (Compl. ¶ 66, Ex. E at 70.) The lease has a ten-year term, running from the earlier of either (1) twelve months from the date of execution or (2) the date that Baum's franchise actually opens for business. (Compl. Ex. E at 71.) It lists, as the "permitted use" for the property, "the operation of

---

[4] These include extensive disclosures mandated by the FTC, and in certain states––including Illinois—prior registration by the franchisor with the state Attorney General's Office. *See* 16 C.F.R. pt. 436; 815 ILCS 705/5(1).

4

a prototypical Grainier Café bakery/restaurant" and states that "Tenant shall operate its business under the trade name 'Grainier Bakery.'" (*Id.* at 77.)  A few weeks later, Hernandez returned from his leave and Molano Parra emailed Baum a draft Franchise Disclosure Document on behalf of Grainier Franchise, outlining the full terms and conditions of their franchise offer.  (*Id*. ¶ 71, Ex. F at 136, Ex. G. at 138.)  In March 2023, Defendants followed up with an exemption letter from the Illinois Attorney General's Office confirming that they would not be subject to the state's preexisting registration requirements.  (*Id.* ¶ 79.)[5]  By that point, however, Baum had begun to demand payments for his expenses and "lost revenue" allegedly created by Defendants' delay in finalizing the franchise paperwork.  (*Id.* ¶¶ 72, 76–78.)

Sometime between March and May of 2023, negotiations between Baum and Defendants broke down.  Precisely why is not clear from the pleadings.  Each side accuses the other of walking away from the bargaining table: Plaintiffs claim that, "[o]n May 11, 2023, after further dialogue regarding compensation for the delay expenses and franchise agreement, counsel for Granier [sic] informed counsel for Baum and DAZ that Granier no longer wishes to pursue a legal or business relationship with Baum and retracted its offer of a Granier's franchise" (*id*. ¶ 81), while Defendants counter that "Baum had withdrawn from . . . buying a franchise first . . . and refused to acknowledge receipt of the Franchise Disclosure Document" (Answer at 17 ¶ 81).  Whatever happened, it is clear that by May 2023, the deal was officially dead—leaving Plaintiffs saddled with an expensive commercial lease to operate a Grainier-branded café for which they lacked franchise rights.  (*See* Compl. Ex. G at 115.)

Plaintiffs filed their five-count complaint in Illinois state court on October 11, 2023.  (Notice of Removal ¶ 1.)  They allege (1) violation of the Illinois Franchise Disclosure Act, 815 ILCS 705/5;

---

[5] The complaint claims to attach this exemption letter as Exhibit H, but the court is unable to find it on the docket.  (Compl. ¶ 79.)  Defendants allege in their answer that Plaintiffs' deal counsel acknowledged and signed this letter, representing that Baum was waiving any objection to exemption from the state Franchise Disclosure Act's requirements, but they also fail to attach any signed copy for the court's review.  (Answer ¶ 6.)

5

(2) promissory estoppel; (3) breach of contract (in the alternative to Count Two); (4) common-law fraud; and (5) violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2.  (*Id.* ¶¶ 85–122.)  They assert actual damages of more than $376,000 in lost revenue, architectural fees and permits, and lease and utility payments, as well as prospective damages of over $1.3 million if they are ultimately unable to use and operate the location as a Grainier franchise.[6]  (*Id.* ¶ 82.)  Defendants were served on December 6, 2023 and timely removed the case on January 5, 2024 based on diversity of citizenship [1].

Defendants filed an answer with affirmative defenses and counterclaims on January 9, 2024 [7], which they later amended with the court's leave on March 1, 2024 [17, 19, 20].  In their Second Amended Counterclaim, they asserted ownership of "worldwide non-exclusive rights to use and sublicense the GRAINIER registered trademark," as well as "confidential information and know-how of the Grainier Brand, such as baking protocols, marketing protocols, site location analysis, equipment requirements and vendors, staffing, and know-how."  (Answer at 35 ¶¶ 55–56.)  They contend that Baum had access to this confidential information through his dealings with Hernandez, Molano Parra, and Conde.  (*Id.* at 35 ¶ 57.)  Plaintiffs preemptively signed the lease, they alleged, "in an effort to obtain leverage" in the franchise negotiation, and had "negotiated lease terms such that if they were not granted a franchise, they could operate a 'copy-cat' Grainier prototypical location using the confidential information they accessed through the CDA."  (*Id.* at 35–36 ¶¶ 58, 63.)  Based on this alleged risk, Defendants seek a declaration from the court "that Plaintiffs may not use the trademark, trade dress and confidential information belonging to the Grainier brand," an injunction against continued unfair competition, and damages plus attorneys' fees and costs.  (*Id.* at 36.)

---

[6]  The Complaint does not specify whether DAZ remained bound to the lease as of late 2023, whether Plaintiffs have attempted to renegotiate its terms since negotiations with Grainier broke down, or what the precise consequences of failing to secure the franchise rights would be for their performance under the lease.

Plaintiffs moved to dismiss this counterclaim on March 22, 2024 pursuant to Rules 12(b)(1) and 12(b)(6). (Pls.' Mot. to Dismiss Am. Countercl. No. 2 [25] (hereinafter "Mot.").) Their motion is now before the court for decision.

## **LEGAL STANDARDS**

A motion to dismiss under Rule 12(b)(1) challenges the court's authority to hear a claim, whether for lack of statutory subject-matter jurisdiction (which Plaintiffs here do not contest) or for lack of a justiciable Article III case or controversy (which they do). *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). "This defense can take the form of a facial or a factual attack on the [nonmoving party's] allegations." *Id.* A facial attack asks whether the nonmoving party has "sufficiently '*alleged* a basis of subject matter jurisdiction,'" with all well-pleaded allegations accepted as true and all reasonable inferences drawn in their favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (emphasis in original) (quoting *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009)). A factual attack asks whether, even if these allegations are "facially sufficient, external facts call[] the court's jurisdiction into question." *Apex Digit.*, 572 F.3d at 444. The parties invoking federal jurisdiction over a claim—here, Defendants—bear the burden to prove that jurisdiction exists. *Id.* at 443.

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a claim. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015). In resolving a motion to dismiss a counterclaim, the court is "obliged to accept all well pleaded facts alleged in the counterclaim as true and draw all reasonable inferences in favor of the nonmoving party." *N. Tr. Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995). The allegations, however, must state a claim for relief that is "plausible rather than merely conceivable or speculative." *Runnion*, 786 F.3d at 526 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).) This means that the nonmoving party must include "enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010). The court generally

may not consider materials outside the pleadings without converting the motion into one for summary judgment under Rule 56, but may validly consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Where a motion to dismiss is brought under both Rule 12(b)(1) and Rule 12(b)(6), the court must address jurisdiction before turning to the merits. *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 n.1 (7th Cir. 2013). Here, Plaintiffs present three grounds for dismissal of the Second Amended Counterclaim: (1) that Defendants have not alleged a sufficient injury to establish standing, (2) that Grainier Franchise lacks standing to enforce the GRAINIER mark as a nonexclusive licensee, and (3) that Plaintiffs have not used the disputed mark in commerce as required under the statute. Although Plaintiffs style both of the first two grounds under Rule 12(b)(1), only the first actually contests the court's subject-matter jurisdiction. The second, in contrast, is really a question of "statutory standing," or whether the claim falls within the zone of interests that the statute protects. *See OrthoPediatrics Corp. v. Wishbone Med., Inc.*, No. 3:20-CV-929 JD, 2021 WL 3887243, at *7 (N.D. Ind. Aug. 31, 2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). "[S]tatutory standing does not implicate jurisdictional concerns but instead looks to concerns about the sufficiency of the claims under a Rule 12(b)(6) analysis." *Id.* Thus, the court will address Plaintiffs' first argument through the lens of Rule 12(b)(1) before turning to their second two arguments under Rule 12(b)(6).

## DISCUSSION

### I. Motion to Dismiss for Lack of Standing

Plaintiffs first argue that the court lacks subject-matter jurisdiction over Defendants' Lanham Act counterclaim because Defendants have not shown that they have suffered or are imminently likely to suffer any commercial injury from Plaintiffs' use of the Grainier brand. Article III of the U.S. Constitution limits federal courts' jurisdiction to "cases" and "controversies." *See* U.S. Const. art III, § 2. The complaining party must have "have suffered or be imminently

threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark*, 572 U.S. at 125 (citation omitted).

Here, Plaintiffs bring a facial challenge to Defendants' counterclaim under Rule 12(b)(1): that their "allegations, taken as true, [do not] support an inference that the elements of standing exist." *Bazile*, 983 F.3d at 279. As they argue, Defendants make "zero allegations" that Plaintiffs have yet used the GRAINIER mark to sell any products or otherwise "use[d] the Grainier brand in any way that would cause commercial damages." (Mot. at 5.) Nor have they alleged that Plaintiffs have taken any further action to develop or publicize the South State Street location as a "Grainier" branch since signing the lease in December 2022. In fact, Plaintiffs point out, the only person who is even aware of their connection to Grainier based on the pleadings is their landlord—and that, in their view, is "far from sufficient to establish an injury to reputation or sales."[7] (*Id.*)

This court previously addressed a similar issue in *Geisha, LLC v. Tuccillo*, 525 F. Supp. 2d 1002 (N.D. Ill. 2007). *Geisha*, like this case, involved a trademark dispute over a food service business: the plaintiff, a Chicago restaurant, alleged that the defendant, a New York frozen food supplier, planned to infringe the plaintiff restaurant's logo by using a "virtually identical" mark in connection with the defendant's own planned restaurant. *Id.* at 1006. While the defendant had not yet opened this restaurant or otherwise used the disputed mark in commerce, he had a "firm intent" to do so and had filed an intent-to-use application for the logo with the U.S. Patent and Trademark Office. *Id.* at 1007–08. The plaintiff filed suit and sought a declaratory judgment that the defendant was infringing its trademark; the defendant opposed this motion on jurisdictional

---

[7] Plaintiffs frame this as an issue of "standing," but it can also be viewed under the related doctrine of ripeness, which asks whether "claims premised on uncertain or contingent events" are unfit for judicial decision. *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676 (7th Cir. 2019); *see Gibson Brands, Inc. v. 225 Parsons, LLC*, No. 1:22-CV-766, 2023 WL 3963754, at *3 (W.D. Mich. June 13, 2023) (noting, in trademark dispute, that "[r]ipeness is related to standing, and shares a foundation in Article III's case-or-controversy requirement.") (citation omitted).

grounds, arguing that there was no "real and immediate" controversy for the court to resolve. *Id.* at 1013.

In deciding *Geisha*, this court applied the Supreme Court's then-recent holding in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), on what constitutes a sufficient "case or controversy" to warrant issuing a declaratory judgment as to parties' IP rights.[8] The *MedImmune* Court framed the ultimate question as whether, " 'under all the circumstances,' a 'definite and concrete' controversy exists between parties having adverse legal interests" that is "of sufficient 'immediacy and reality to warrant the issuance of a declaratory judgment,' such that a declaration would not simply amount to 'an opinion advising what the law would be upon a hypothetical state of facts.' " *Geisha*, 525 F. Supp. 2d at 1013 (quoting *MedImmune*, 549 U.S. at 127). Subsequent courts applying *MedImmune*'s test "focused on whether the potential infringer's proposed future activities were definite enough, or had progressed sufficiently, to create a 'real and immediate' threat of infringement." *Id.* at 1014. The *Geisha* plaintiff's claim did not meet this test: the defendant's "actual preparations for opening a restaurant d[id] not appear to have advanced significantly beyond [h]is statement of intent" in filing an application with the PTO, and were limited to " 'play[ing] around with' a menu and searching for a suitable location." *Id.* at 1015.

Post-*Geisha* cases in other circuits have taken a similar approach in assessing motions to dismiss requests for declaratory and injunctive relief in IP disputes. *See, e.g.*, *AARP v. 200 Kelsey Assocs., LLC*, No. 06 CIV. 81 (SCR), 2009 WL 47499, at *7–9 (S.D.N.Y. Jan. 8, 2009) (citing *Geisha* in applying *MedImmune* test to deny motion to dismiss trademark action for

---

[8] This case involves a slightly different procedural posture to *Geisha*, but the underlying rationale of that case still holds. Defendants here have not brought an independent claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, as the *Geisha* plaintiffs did; rather, they have brought a claim for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), and requested relief in the form of "a declaration that Plaintiffs may not use the trademark, trade dress and confidential information belonging to the Grainier brand," as well as an injunction against further competition and damages. But the Declaratory Judgment Act's "case of actual controversy" requirement mirrors Article III's underlying requirements for standing. *See Amling v. Harrow Indus. LLC*, 943 F.3d 373 (7th Cir. 2019) (noting that "[t]he requirements of the Act and those of Article III are . . . coextensive").

declaratory and injunctive relief); *D and D Greek Rest., Inc. v. Great Greek Franchising, LLC*, No. CV 20-9770-MWF (KSX), 2021 WL 4464201, at *3–6 (C.D. Cal. Aug. 3, 2021) (same); *Gibson Brands, Inc. v. 225 Parsons, LLC*, No. 1:22-CV-766, 2023 WL 3963754, at *6–7 (W.D. Mich. June 13, 2023) (same). As these courts have found, "where a party has not yet identified a name or location of a business, or has not secured—or attempted to secure—the central components of the formula ordinarily required for production, the case or controversy standard is unlikely to be satisfied." *AARP*, 2009 WL 47499, at *8. In contrast, "[w]here . . . a party has produced prototypes or samples of the allegedly infringing products, begun soliciting—and advertising to—potential customers, or otherwise invested significant sums of money in preparation for producing the goods, the case or controversy requirement is likely to be satisfied." *Id.* at *9.

Under these principles, Defendants' counterclaim succeeds where the claim in *Geisha* failed. As an initial matter, the standard of review is looser here, where Plaintiffs are moving to dismiss, than in *Geisha,* where the alleged infringer sought summary judgment. *See D and D*, 2021 WL 4464201, at *4 (distinguishing *Geisha* on this basis). Moreover, the allegations here suggest a greater risk of imminent unfair competition, even if Plaintiffs have not actually opened for business. The prospective restaurateur in *Geisha* had not yet secured a location for his restaurant, hired a real estate agent to find one, or taken any steps beyond designing a menu and "driving around" certain neighborhoods. *Geisha*, 525 F. Supp. 2d at 1015. Baum, in contrast, has reviewed multiple letters of intent for a specific address, signed a finalized lease, and engaged an architect to renovate the space in accordance with Grainier's specifications. Plaintiffs' own allegations of damages assert that Baum has substantially invested in these preparations, including architectural, rent, and utility costs. *See D and D*, 2021 WL 4464201, at *5 (finding, where defendants had "committed themselves to using the [trademarked] name . . . [and] opening the restaurants by a certain date, and [had] identified the locations of the restaurants," that their "'actual preparations for opening a restaurant' ha[d] advanced significantly beyond a mere statement of intent") (citing *Geisha*, 525 F. Supp. 2d at 1015).

Plaintiffs' contractual commitments under the lease also support the existence of a live and justiciable controversy. While the precise scope of these commitments is not fully clear from the parties' pleadings and briefing, it appears—based on the copy of the lease attached to the complaint—that Plaintiffs are locked into a ten-year rental term, starting no later than December 23, 2023 (twelve months from execution), to operate a "prototypical Grainier Café" as the premises' only permitted use. (Compl. Ex. E at 71, 77.) Nor can Plaintiffs simply sit on the property without taking further action: the lease requires the tenant to "continuously operate its business" during the effective term, or else be found in default. (*Id.* at 78.) And while there is an option to change the business's trade name from "Grainier Bakery" to another name with prior landlord approval (*id.* at 77–78), Baum has already gleaned substantial insight into the Grainier chain's branding and operations from his discussions with Hernandez, Molano Parra, and Conde. All of these facts suggest that Plaintiffs are both well-poised and incentivized to profit from using the Grainier brand without paying for it, even if they have not yet done so. *See AARP*, 2009 WL 47499, at *9. The court thus finds that Defendants adequately allege a basis for constitutional standing to bring their Second Amended Counterclaim.

## II. Motion to Dismiss for Failure to State a Claim

### A. Nonexclusive Licensee's Ability to Enforce Trademark

Plaintiffs' next argument for dismissal is that Defendants lack sufficient rights in the GRAINIER mark to bring a Section 43(a) claim for unfair competition. Defendants' counterclaim alleges that Grainier Franchise (one of the two Florida-based LLC Defendants) has "worldwide non-exclusive rights to use and sublicense the GRAINIER registered trademark" from its owner Consupan, S.L.[9] (Answer ¶ 55.) In Plaintiffs' view, this is not enough to establish statutory

---

[9] It would appear from the terms of Defendants' draft franchise disclosure document that Defendant Grainier USA possesses equivalent nonexclusive licensing rights to the GRAINIER mark (s*ee* Compl. Ex. G at 145), but Defendants' counterclaim only discusses Grainier Franchise. (*See* Answer at 35 ¶¶ 55–56.)

standing: as a "mere licensee[]" of the mark, they contend, Grainier Franchise cannot sue to enforce the Lanham Act's protections. (Mot. at 5.)

Section 43(a) of the Lanham Act provides a private right of action for unfair competition against "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, or symbol, or device, or any combination thereof" in a way that is "likely to cause confusion" as to their affiliation or sponsorship, or that "misrepresents the nature, characteristics, qualities, or geographic origin" of their goods and services in commercial advertising. 15 U.S.C. § 1125(a). This right may be enforced by any person who "believes that he or she is or is likely to be damaged by such act."[10] *Id.* The Supreme Court in *Lexmark* interpreted this language to confer standing on any party that has suffered "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark*, 572 U.S. at 140. Thus, while a "plaintiff need not be the owner of a registered trademark in order to have standing to sue" under Section 43(a), they must still show "proof of ownership of a proprietary right or a reasonable interest to protect." *Holbrook Mfg. LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 329 (N.D. Ill. 2020) (citing *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 867 (N.D. Ill. 2009)).

The court is satisfied that Defendants have met this burden—at least at this stage. The caselaw is clear that "a licensee may assert a Section 43(a) claim against . . . third parties," though their ability to do so may be circumscribed by the "express language" of their licensing agreement. *Gruen Mktg. Corp. v. Benrus Watch Co.*, 955 F. Supp. 979, 983 (N.D. Ill. 1997); *Holbrook*, 497 F.

---

[10] Defendants' only Lanham Act counterclaim is for unfair competition under Section 43(a); they do not assert a claim for trademark infringement under Section 32(1), 18 U.S.C. § 1114(1), which "only the current owner of the mark"—i.e., the trademark registrant or their assignee—would have standing to enforce. *Gabet v. Amazon.com Inc.*, 693 F. Supp. 3d 966, 974 (S.D. Ind. 2023) (citing *Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014)). There is no contention that the agreement between Consupan and Grainier Franchise constitutes an assignment. *Gruen*, 955 F. Supp. at 982 ("An assignment of a mark is an outright sale of all rights in that mark, whereas a license is a limited permit to another to use the mark.") (citation and internal quotation marks omitted).

Supp. 3d at 329.[11]  In *Holbrook*, licensed suppliers sued over a competitor's alleged misuse of the third-party marks to which they held license rights, then moved for a preliminary injunction. 497 F. Supp. 3d at 326–27.  In ruling on this motion, the district court first addressed the "threshold issue" of statutory standing and concluded that "[b]ecause Plaintiffs have shown . . . [they] are licensed suppliers of [the trademarked products] and are likely to lose business and goodwill based on Defendants' misuse of the marks, [they] have sufficiently established that they have standing to allege a Lanham Act claim against Defendants based on Defendants' use of these marks."  *Id.* at 329 (citing *Gruen*, 955 F. Supp. at 984).  Here, too, Defendants have alleged that they (1) are licensees of the GRAINIER mark, and (2) are likely to suffer commercial harm if Plaintiffs make use of their brand.  This satisfies Section 43(a)'s requirement of "a proprietary right or a reasonable interest" to be protected via lawsuit.  *Id*.

Plaintiffs cite several cases in which trademark licensees were barred by the express terms of their licensing agreements from suing under Section 43(a).  *See, e.g.*, *Fin. Inv. Co. (Bermuda) v. Geberit AG*, 165 F.3d 526, 532 (7th Cir. 1998) (finding that, "[e]ven assuming [the plaintiffs] met the statutory requirement[s]" under Section 43(a), "the express terms of the license prohibited any of them from bringing suit in their own capacity"); *A&L Indus., LLC v. Weaver Enters., Ltd.*, No. 20-CV-552-SLC, 2021 WL 3856745, at *14 (W.D. Wis. Aug. 30, 2021) (finding that clause giving licensor "the right in its sole discretion to decide what, if any, [enforcement] action to take and whether to institute and prosecute any actions or proceedings . . . prohibit[ed] the licensee from having the right to sue . . . . under § 1125(a)") (citation omitted); *Kroma Makeup*

---

[11] Plaintiffs also cite *Gruen*, but it does not support their position.  That case involved a dispute between an exclusive trademark licensee and its own licensor; the court held that while the plaintiff had "standing under Section 43(a)" to enforce the trademark, it still failed to state a claim because the parties' dispute was solely governed by the exclusivity terms of their licensing contract, not the Lanham Act.  *Gruen*, 955 F. Supp. at 984.  *Gruen*'s intermediate holding about standing cuts in Defendants' favor, not Plaintiffs'.  And its ultimate holding is irrelevant since the licensed trademark rights at issue here are owned by neither Plaintiffs nor Defendants, but a third party—Consupan.

*EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 709–10 (11th Cir. 2019) (finding that licensing agreement's terms "read together . . . indicate[d] that [the trademark owner] alone ha[d] the exclusive right to sue for infringement"). These and other such cases could be relevant if Grainier Franchise is contractually precluded from enforcing the GRAINIER mark under its licensing agreement with Consupan, but at this point neither party has proffered a copy of this agreement—nor is it even clear that the court could validly consider such a document at this stage without converting Plaintiffs' motion to dismiss into one for summary judgment. *See Williamson*, 714 F.3d at 436; (citing FED. R. CIV. P. 12(d)); *In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 951 (N.D. Ill. 2016) ("Questions of statutory standing are reviewed under Rule 12(b)(6), not Rule 12(b)(1), and the Court's inquiry into statutory standing at the motion to dismiss stage is limited to the pleadings.").

Nor does it matter, as Plaintiffs contend, that Grainier Franchise's license is nonexclusive rather than exclusive. While the Seventh Circuit does not appear to have squarely addressed this question, both other circuits and district courts within this circuit have read Section 43(a)'s right of action for "any person who believes that he is or is likely to be damaged" to encompass nonexclusive licensees. *See Rosati's Franchise Sys., Inc. v. Rosati*, No. 05 C 3146, 2006 WL 163145, at *8 (N.D. Ill. Jan. 17, 2006); *D.H. Pace Co., Inc. v. OGD Equip. Co., LLC*, 78 F.4th 1286, 1296 (11th Cir. 2023); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir. 1977).

Plaintiffs improperly conflate the premise that "a licensing agreement can restrict [a licensee's] broad right to sue" under Section 43(a) with the (incorrect) notion that a licensee must be affirmatively *granted* that right to sue by contract. *D.H. Pace*, 78 F.4th at 1296. More accurately, "without the licensing agreement posing a contractual bar to [the licensee]'s ability to sue, [the licensee] is free to bring a Lanham Act claim, subject to the statute's restrictions as explained by *Lexmark*." *Id.* Accordingly, the court finds that Defendants' allegations plausibly

15

establish Grainier Franchise's statutory standing to enforce the GRAINIER mark under Section 43(a) of the Lanham Act.

### B. "Use in Commerce" Requirement

Finally, the court turns to Plaintiffs' argument that Defendants' pleadings fail to satisfy the Lanham Act's "use in commerce" requirement. This argument merits only brief discussion, as it overlaps substantially with Plaintiffs' standing challenge.[12] Essentially, Plaintiffs contend that Defendants have not alleged they have used the GRAINIER mark to sell any products, place any advertisements, or take any other steps towards opening a Grainier-branded location beyond signing a lease—and have thus failed to establish that they have "use[d] [the mark] in commerce" in a way that is "likely to cause confusion" among consumers. 15 U.S.C. § 1125(a).

While Section 43(a) does not necessarily require an "actual *sale* of an allegedly infringing product" to establish "use in commerce," it does require something more than a "mere intent" to infringe. *AARP*, 2009 WL 47499, at *10 (emphasis added) (citations omitted). Courts, however, have found that "[p]re-sales preparations such as advertising, seeking investors, registering a domain name and other preparatory activities" are sufficient to support a grant of preemptive injunctive relief "if the plaintiff can prove that [these] preparatory actions are underway and will likely result in a violation of the Lanham Act." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:10 (5th ed.) (collecting cases); cf. *VitalGo, Inc. v. Kreg Therapeutics, Inc.*, 370 F. Supp. 3d 873, 885 (N.D. Ill. 2019) (noting, in rejecting defendants' laches defense to plaintiffs' infringement and unfair competition claims, that "a plaintiff may sue when a defendant's infringing use of the mark is imminent, not when the plaintiff has any reason whatsoever to believe an infringing use could occur at some uncertain time in the future").

---

[12] The difference between these two arguments is that the "use in commerce" element is "not a jurisdictional requirement," see *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 872–73 (9th Cir. 2014), meaning that it is properly assessed under Rule 12(b)(6) as part of the merits of the case on a motion to dismiss.

16

The Fifth Circuit's decision in *Viacom International v. IJR Capital Investments, LLC*, 891 F.3d 178 (5th Cir. 2018), is on point. *Viacom* involved a Section 43(a) claim against the defendant's planned use of a trademarked name, the "Krusty Krab," for a restaurant. The restaurant had not officially opened, but the defendant had filed an intent-to-use trademark application, leased property and bought equipment, purchased a domain name, and developed a business plan for potential investors. *Id.* at 183–84. The Fifth Circuit found that the defendant's preparations created a sufficient "likelihood of confusion" as to the mark's affiliation and affirmed summary judgment in favor of the mark's owner. *Id.* at 193–98. Similarly, in *JGX, Inc. v. Handlery*, the plaintiffs sued to enforce rights in their trademarked restaurant name after their former landlord continued to display signage and menus using the mark in their previously leased space, and made public statements that the restaurant "isn't moving anywhere" and "will remain" at the same location. No. 17-cv-00287-BLF, 2018 WL 984856, at *3–4 (N.D. Cal. Feb. 20, 2018). The court was "not convinced that Plaintiffs have alleged *actual* use of the [disputed] mark, as there is no dispute that Defendants have not actually operated the restaurant," but nevertheless concluded that they had "adequately allege[d] a threat of imminent use," noting that "the law does not require the Court to wait until Defendants physically re-open their doors." *Id.* at *4 (emphasis in original).

The facts here are not quite as clear-cut as in *Viacom* and *JGX*: while Plaintiffs here have taken concrete and extensive steps to prepare the South State Street location for use as a Grainier franchise, as discussed above, Defendants do not allege that they have publicized their intended franchise at all (or presented any evidence of actual consumer confusion).[13] If Defendants are arguing that Plaintiffs' act of having "falsely advertised and misrepresented to

---

[13] *Cf. Violet Crown Cinemas, LLC v. Int'l Dev. Mgmt., LLC*, No. 1:21-CV-01142-RP, 2022 WL 2078029, at *4–6 (W.D. Tex. June 9, 2022), *report and recommendation adopted*, 2022 WL 3449499 (W.D. Tex. July 14, 2022) (finding that plaintiff had demonstrated sufficient likelihood of imminent infringement based on, *inter alia*, exhibits to complaint showing press coverage that mistakenly assumed plaintiff was affiliated with defendant's planned entertainment complex); *Gibson*, 2023 WL 3963754, at *6 (finding, where defendant used disputed marks in marketing materials, that "the alleged infringement is not conjectural or hypothetical . . . [but] is already occurring through the use of its marks in the promotion of the ultimate entertainment destination").

17

[their] landlord [their] authority to use the GRAINIER mark and brand" is in itself an actionable "use in commerce," the court does not find that argument compelling. (Answer ¶ 60.) If Baum does not take further steps towards developing the South State Street location as a Grainier franchise, or otherwise claim unauthorized affiliation with the Grainier brand, it seems unlikely that any court intervention will be necessary to protect Defendants' trademark rights.

The court nevertheless declines to weigh in on the merits of Defendants' unfair competition claim on the current record. Neither party has stated that Plaintiffs have attempted to renegotiate or cancel their obligations under the lease, or disclaimed their intention to operate a Grainier franchise at the South State Street location. Absent any such information, Defendants' allegations are sufficient to establish a claim of imminent misuse of their licensed trademark. Summary judgment submissions may prove illuminating. *See Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, No. 12 C 9686, 2016 WL 723135, at *1–2, *6–10 (N.D. Ill. Feb. 24, 2016) (denying cross-motions for summary judgment on trademark infringement and unfair competition claims arising from defendant's continued use of plaintiff's trademarks after franchise negotiations broke down); *Sparks Tune-Up Ctrs., Inc. v. Panchevre*, No. 90 C 4369, 1992 WL 211029, at *1, *4–8 (N.D. Ill. Aug. 21, 1992) (granting plaintiff franchisor's motion for summary judgment on declaratory judgment, infringement, and unfair competition claims where defendants opened an unauthorized franchise after negotiations broke down).

## CONCLUSION

Plaintiffs' motion to dismiss Defendants' Second Amended Counterclaim [25] is denied. Plaintiffs are directed to file answer on or before September 30, 2024.

ENTER:

Dated: August 30, 2024

REBECCA R. PALLMEYER
United States District Judge